**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIIGAN**

**SHERRY KATZ-CRANK**, a Michigan
resident,

            Hon.

        Plaintiff,

    v.                    Case No: 1:12-1335

**KIMBERLY HASKETT**, individually
and in her official capacity as an
investigator for the Indiana Secretary of State,

**CHARLIE WILLIAMS**, individually and in his
official capacity as an investigator for the
Indiana Secretary of State,

**TODD ROKITA**, individually and as former
Secretary of State for Indiana,

**CARL BRIZZI**, individually and as former
Prosecutor for Marion County, Indiana,

**MARY HUTCHISON**, individually and as
Assistant Prosecutor for Marion County, Indiana,

**BARBARA CRAWFORD**, individually and as
Former Assistant Prosecutor for Marion County,
Indiana,

**THOMAS TRATHEN**, individually and as Chief
Investigator for Marion County, Indiana,

and **MARION COUNTY INDIANA,**

        Defendants.

_____/

BLANCO WILCZYNSKI, PLLC
Orlando L. Blanco (P34480)
Derek S. Wilczynski (P57079)
Attorneys for Plaintiff
2095 E. Big Beaver, Ste 400
Troy, Michigan 48083
(248) 519-9000

_____/

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, Sherry Katz-Crank, by and through her counsel, BLANCO WILCZYNSKI, PLLC, and for her Complaint against Defendants states as follows:

## GENERAL ALLEGATIONS

1.     Plaintiff, Ms. Katz-Crank, is an attorney who has practiced law in good standing in the State of Michigan for over 25 years.   She was a partner with Miller Canfield, the largest and oldest firm in the State of Michigan, for over eleven years and served as General Counsel for one of the largest managers of schools in the country. She is also a former Special Assistant Attorney General for the State of Michigan. She graduated from Notre Dame Law School in the top 25% of her class and received a Bachelor's Degree cum laude from the University of Michigan.

2.     In 2004, she performed legal services for Robert Nelms. Nelms was an experienced operator of cemeteries and funeral homes in New Jersey who was seeking to purchase certain cemeteries and funeral homes in the states of Indiana, Michigan and Ohio. The sale was completed on or about December 22, 2004 with the assistance of approximately 7 different law firms, including Plaintiff.

3.     Almost five years later, on or about July 18, 2009, Katz-Crank was wrongfully charged in Marion County Indiana with crimes which she did not commit, including five felony counts of theft of over $100,000 each. In essence, Defendants contended that Plaintiff, through the provision of her legal services, aided and abetted Nelms in stealing the cemetery assets when she provided legal advice to him in connection with his purchase of the cemeteries in December of 2004.

2

4.      On or ab out J uly 18,  20 08,  Plaintiff w as  arrested a nd  placed  in a processing facility in the bowels of the Marion County jail in Indianapolis where she was handcuffed, subjected to a body cavity search, requested to take an AIDS test, received no food, no blanket, no cot or other place to rest, and was provided access to a single open toilet for the over 150 f emale inmates (with no t oilet paper), received no sa nitary access to w ater (only  a w ater f ountain)  to  clean her  h ands  and  remove her  co ntact lenses.

5.      Following her release, Plaintiff was subjected to over two and a half years of delay before receiving a t rial by jury.  The delays included repeated failures by the Prosecutor t o t urn over por tions  of  the g rand j ury t ranscripts  as  required by  M arion County's own rules and procedures and despite orders of the court to do so.

6.      Despite the provision of evidence which substantiated her innocence and repeated requests from her legal counsel for specific information regarding the basis for the charges, no such information was forthcoming.

7.      During the course of the trial, it was discovered that exculpatory evidence had not been produced or provided to the grand jury.

8.       In addition, the investigators and prosecutors had a r easonable basis to believe that information provided by certain witnesses was false.

9.      Despite the grand jury's specific request, prosecutors never provided the grand j ury with jury instructions as to the material elements of the crimes with which Plaintiff was charged, instead, providing a copy of the annotated statute. In addition, the materials which w ere pr ovided t o t he grand j ury were not  preserved as  required by Marion County's own rules, policies, and procedures.

3

10.    On December 7, 2010, two and a half years later, Ms. Katz-Crank was found innocent of all charges by a jury and the charges were dismissed.

11.    These and other constitutional deprivations lead to unimaginable suffering by Plaintiff including the loss of her liberty, her ability to pursue her profession, loss of her businesses, and loss of reputation in her community and profession.  In addition, she suffered from significant mental and physical ailments as a result of the wrongful allegations including major depressive disorder, post-traumatic stress disorder, and various physical disorders including two surgical procedures and hospitalizations.

12.    In short, Plaintiff has suffered serious trauma as a result of Defendants' deliberate disregard, recklessness, and willful and wanton deprivation of her constitutional and civil rights.

13.    The political hubris exercised by the Indiana Secretary of State and the former Marion County Prosecutor directly resulted in the loss of her law firm, other business interests, her savings and pension, and financial losses of well over $2.1 million.

14.    In addition, Plaintiff continues and will continue to suffer from the wrongful accusations which are contained in defamatory press releases, articles on the internet, and other publications, including articles on the Indiana Secretary of State and Marion County Prosecutor's own websites. It is clear that Plaintiff's indictment was used as marketing material to support the political campaigns of Defendants for higher office without regard for the serious and permanent damage which it would impose upon Plaintiff and her family.

4

15.     The fact that Katz-Crank was made a target of the Indiana Secretary of State and Marion County Prosecutors' investigation is rendered more remarkable by the fact that the Financial Industry and Regulatory Authority ("FINRA"), which is statutorily charged by the federal government with investigating these types of matters, found in an independent investigation that it was Katz-Crank's actions in reporting the alleged scheme to authorities in Michigan and Tennessee which ultimately lead to the investigation and conviction of the individuals responsible for the thefts, and ultimately the recovery of tens of millions of cemetery trust assets.

## THE PARTIES

16.     Plaintiff Sherry Katz-Crank is an attorney licensed to practice law in the State of Michigan.  In addition, at all times relevant hereto Plaintiff has resided in Clinton County, Michigan.

17.     Defendant Kimberly Haskett is an investigator in the Securities Division for the Secretary of State's Office for Indiana.

18.     Defendant Charlie Williams is an investigator in the Securities Division for the Secretary of State's Office for Indiana.

19.     Todd Rokita is the former Secretary of State for Indiana.

20.     Carl Brizzi was the former prosecutor for the State of Indiana County of Marion at all times relevant hereto.

21.     Mary Hutchison is an assistant prosecutor for Marion County.

22.     Barbara Crawford is a former assistant prosecutor for Marion County.

23.     Thomas Trathen is the Chief Investigator for Marion County.

24.     Marion County is a subdivision of the State of Indiana.

5

## JURISDICTION AND VENUE

25.     This Court has pendent jurisdiction over the state claims pursuant to 28 U.S.C. 1367. This Court has federal question jurisdiction over the parties pursuant to 42 U.S.C. Section 1983; 42 U.S.C. Section 1986; and 42 U.S.C. Section 1988(b).

26.     This Court also has diversity jurisdiction over the parties pursuant to 28 U.S.C. 1332.

27.     Venue is proper in the Western District of Michigan as Plaintiff is a resident of East Lansing, Michigan and the criminal charges which are the subject of this proceeding arose out of legal services which Plaintiff performed in the State of Michigan at her offices in East Lansing, Michigan. The documents which formed the basis for the charges were drafted, finalized, and at all times relevant hereto were business records kept in the State of Michigan. The witnesses to this proceeding reside in Michigan, Indiana, New Jersey, and Connecticut and convenience does not favor one jurisdiction over another. The State of Michigan has an overriding interest in this matter to ensure that residents of Michigan, and specifically attorneys who are licensed in the State of Michigan and perform legal services in this State, are not subject to unlawful prosecution by investigators, prosecutors, and other state and local officials of another state who are exercising their authority and jurisdiction over persons and property residing in and located within the State of Michigan.

28.     The amount in controversy in this matter is more than $75,000.00.

## COUNT I: MALICIOUS PROSECUTION

29.     Plaintiff hereby incorporates and restates the allegations in paragraphs 1 through 28 as if fully set forth herein.

6

30.     Plaintiff Sherry Katz-Crank has been an attorney licensed and in good standing in the State of Michigan since November of 1987.  During this time and to this date she has never had a grievance or any disciplinary action taken against her by the State Bar of Michigan or any other state.

31.     Katz-Crank was an attorney with two of the largest and oldest law firms in the State of Michigan for over 18 years. She was elected to partnership in the Labor and Employment Division of Miller Canfield in 1998.  During that she developed a practice in the area of state regulation of cemeteries.

32.     In 2004, she opened her own firm known as Corporate Legal Counsel whose address was 4660 Hagadorn Rd.  Suite 200, East Lansing, MI 48823.

33.     In 2006, she formed a management company for the purpose of providing for the management of trust services to cemeteries which also was located at 4660 Hagadorn Rd. Suite 200, East Lansing, MI.

### THE "SMART" TRANSACTION

34.     For over eight years from approximately 1999 to 2007, Plaintiff provided legal representation to 28 cemeteries in the State of Michigan.   These properties constituted the largest holdings of privately owned and operated cemeteries in the State of Michigan.

35.     In August of 2004, the then owner of the 28 Michigan cemeteries, Craig R. Bush, sold his interest in the 28 Michigan cemeteries to Clayton R. Smart, a purportedly wealthy oil and gas operator from Oklahoma, totaling approximately $45 million (the "Smart Transaction").  At the time, Smart was a resident of the State of Oklahoma.

36.    The sale from Bush to Smart was subject to the approval of the State of Michigan Cemetery Commissioner who determined that Smart was qualified by experience, financial means, and good character to own cemeteries in the State of Michigan.

37.    In Michigan, cemeteries are required by law to place in trust a portion of the proceeds from the sale of each cemetery plot for the care and maintenance of the cemetery into the future.  These trusts are generally known as "perpetual care trusts."

38.    In Michigan, cemeteries are also required by law to place in trust the value of merchandise purchased by cemetery consumers such as vaults and markers to ensure that the money is available to purchase the goods at the time that they are required.  These trusts are generally known as "merchandise trusts."

39.    Prior to the sale of the Michigan cemeteries from Bush to Smart there was over $61 million in both the perpetual care and merchandise trusts.

40.    Pursuant to Michigan law a trustee is selected by the cemetery owner to oversee the trust accounts.

41.    The cemetery owner also selects an investment advisor to invest the trust proceeds so that they make an appropriate return or rate of interest.

42.    In this case the investment advisor for the Michigan cemetery trusts was Mark Singer, Vice-President of Wealth Management in Pennsylvania for Smith Barney, a division of Citi-Group.

43.    Plaintiff became acquainted with Mark Singer through her representation of the Michigan cemeteries.

8

## THE "NELMS" TRANSACTION

44.    In l ate 20 04, S inger r eferred R obert N elms, an  owner and  operator of funeral homes in New Jersey to Plaintiff in connection with the purchase by Nelms of cemeteries in t he S tates of M ichigan, O hio and I ndiana, totaling appr oximately $23 million (the "Nelms Transaction").  At the time, Nelms was a resident of the State of New Jersey.

45.    Nelms retained Plaintiff to provide legal services in the State of Michigan to opine as to whether a cemetery trust could lawfully issue debentures.

46.    Debentures  are a co  rporate i nstrument w hereby an ent ity  may  invest money.

47.     Nelms acknowledged that Plaintiff was not licensed in the States of Ohio and Indiana and would have to obtain legal counsel in those respective states to provide a legal opinion.  .

48.    Plaintiff w as  paid at  her nor mal hour ly r ate and su  bmitted bi lls on a monthly basis.

49.    Plaintiff's compensation in connection with her legal services totaled less than twenty thousand dollars.

50.    Plaintiff did not negotiate the purchase of the cemeteries by Nelms or draft the Purchase Agreement.

51.    Plaintiff had no ownership interest or any other interest in the purchase of the cemeteries by Nelms.

52.     Plaintiff's  legal se rvices  in co nnection w ith t he p urchase by  N elms occurred i n November an d D ecember of 2 004.  All l egal se rvices pertaining to N elms

purchase were completed as of the date of the closing on or about December 22, 2004.

53.     Plaintiff did not attend the closing and none of the sale or trust proceeds were ever placed in a trust or other account maintained by Plaintiff.

54.     At no time in 2004 or 2005 did Plaintiff have any supervision or control over the cemetery trust proceeds from the purchase of the cemeteries by Nelms.

55.     The closing occurred at a title company in Indiana and the trust proceeds were transferred from Forethought Trust and Savings to Community Trust and Investment in Indiana as agreed between Nelms and the Meyers.

56.     At the time of the purchase by Nelms there was approximately 22 million in the perpetual care and merchandise trust accounts in the States of Michigan, Ohio, and Indiana.

57.     Following the closing by Nelms, Plaintiff continued her representation of the Michigan cemeteries and was not involved in further matters with Nelms until approximately August of 2005.

58.     In October of 2005, Singer and Smart contacted Plaintiff and requested that she attend a meeting with the current trustee, Community Trust and Investment ("Community"), to investigate Smart's allegations that Community had mismanaged the Michigan cemetery trust accounts.

59.     Ultimately, the Department of Financial Institutions for the State of Indiana concluded that Community Trust and Investment had mismanaged the cemetery trust accounts and required Community to divest itself of all clients with cemetery trust assets.

**THE FORMATION OF SFMC**

60.     At Smart's request, Plaintiff located another banking institution in Michigan that was willing to act as custodian of the Michigan trust funds.  The banking institution was Citizens Bank headquartered in Flint, Michigan.

61.     Citizens agreed to act as custodian of the Michigan trust funds for Smart and requested that Plaintiff provide legal services for the trusts and coordinate the accounting and auditing functions.

62.     In December of 2005, Plaintiff formed Security Financial Management Company ("SFMC") to provide these services to the Michigan cemeteries.  SFMC entered into an Agreement to act as trustee for the approximately $60 million in Michigan cemetery trust assets for the 28 Michigan cemeteries then owned by Clayton Smart.

63.     Smart directed SFMC to use Smith Barney and financial advisor Mark Singer to handle the investments for the Michigan cemetery trust assets.

**DISCOVERY AND REPORTING OF THE**
**THEFT OF THE CEMETERY TRUST FUNDS**

64.     Less than a month after SFMC was appointed trustee for the 28 Michigan cemetery trusts, Katz-Crank discovered wire information that indicated that Smart had misappropriated substantial trust assets while the funds were under the control of the former trustee, Community Trust and Investment.

65.     Katz-Crank immediately reported this activity to the Michigan Attorney General's office, the Michigan Cemetery Commissioner, the Ingham County Prosecutor, and the Tennessee Bureau of Investigation, among others.

11

66.     On January 22, 2006, Katz-Crank withdrew from her long standing representation of the Michigan cemeteries.

67.     In February of 2006, Katz-Crank also advised executives of Citi-Group/Smith Barney of her concerns.

68.     Following Katz-Crank's report to the authorities, SFMC attempted to freeze all of the Michigan cemetery trust funds to avoid any further illegal activity.

69.     Smith Barney, without SFMC's authorization or approval, terminated SFMC's accounts with Smith Barney and approved a transfer of the Michigan cemetery trust funds to INA fsb, a trustee from the State of Delaware where the misappropriation of the trust assets by Smart and Singer continued.

70.     Following the termination of SFMC's accounts with Smith Barney, Katz-Crank again contacted the authorities to voice her concerns that Smith Barney's actions were furthering the depletion of the cemetery trust funds.

71.     Mark Singer, the financial advisor from Smith Barney, was indicted in Indiana and Tennessee and is currently serving a sentence in Indiana for the commission of several felonies including fraud. In addition, he is currently awaiting trial in the State of Tennessee for similar acts.

72.     Clayton Smart was also indicted and is currently serving a sentence in Tennessee for the commission of several felonies including fraud. He also pled guilty to similar acts in Michigan and pled guilty to federal charges of tax evasion.

73.     FINRA, the regulatory body responsible for the oversight and regulation of broker dealers, fined Smith Barney $1.5 million dollars for, among other failures, inadequately supervising Mark Singer.

74.     At the Michigan Attorney General's request, Katz-Crank agreed to testify against a number of the co-conspirators, including Smart and Bush.

75.     As a result of Katz-Crank's testimony, the Ingham County Circuit Court froze $22 million of Bush's assets which resulted in the recovery of over $10 million in cemetery trust assets.

76.     Katz-Crank did not request any form of immunity in exchange for her testimony and declined any form of reimbursement for her costs of testifying.

77.     Nelms had also placed cemetery trust assets with SFMC and Citizens Bank.  In late 2007, Katz-Crank discovered that Nelms was also under investigation and terminated his involvement with SFMC and Citizens Bank.

78.     She then contacted Kim Haskett of the Indiana Secretary of State Securities Investigation Unit and offered to provide assistance and respond to any inquiries which she may have.   Haskett never responded to the telephone call and never requested any information or documentation from Katz-Crank or SFMC.

79.     Instead, Haskett contacted Plaintiff's clients and prospective clients and advised that she was involved in illegal activity and that they should not continue to use her services.

80.     In 2008, Nelms was charged with embezzling approximately $22 million in cemetery trust funds, pled guilty, and was sentenced to eight years house arrest and community placement.  Due to a plea bargain which included testifying against Plaintiff, Nelms will never spend a day in jail in Indiana.

81.     Nelms also pled guilty to similar charges in Michigan and  will serve approximately eighteen months in jail.

13

82. Katz-Crank did everything within her power to prevent the theft of the cemetery trust assets.

83.     The Defendants were well aware that Plaintiff acted to protect the cemetery trust assets and to report suspected theft by Smart and Nelms upon her discovery of the underlying thefts. Despite such knowledge, Defendants acted with deliberate indifference and/or with a callous or reckless indifference to the violation of Plaintiff's constitutional rights resulting in her arrest, detention, and an over two and a half years hiatus awaiting her jury trial and ultimate acquittal.

84.     Among other things, Defendants' deliberate indifference to Plaintiff's constitutional rights is evidenced by the fact that they failed to advise the grand jury of the following:

A.     They did not provide the grand jury with exculpatory evidence which would have demonstrated that Plaintiff was the individual who discovered and reported the theft of cemetery trust assets in Michigan and Tennessee.

B.     They provided the grand jury with testimony which they knew was false.

C.     Despite the fact that there was no evidence that Plaintiff engaged in a theft of the cemetery trust assets or exercised any control over the embezzled trust assets, Defendants requested that the grand jury charge Plaintiff with five felony counts of theft over $100,000.

D.     Defendants failed to advise the grand jury that at least four different law firms, seven attorneys, and 2 certified public accountants were involved in the purchase of the cemeteries by Nelms all of whom had equal or greater access to the details of Nelms purchase than Plaintiff and none objected to or reported any alleged theft to the authorities at the time of the purchase.

E.     The payment to Plaintiff for legal services was supported by signed retention agreements with normal hourly rates and detailed descriptions of the services rendered.

14

F.     Defendants contended that t he use of de bentures prepared by Plaintiff w ere i llegal desp ite t he fact t hat Defendants knew t hat identical de bentures had been use d by the pr evious cemetery owner in the State of Indiana for decades.

G.     Defendants did not disclose to the grand jury that an independent law firm was hired by Plaintiff to examine the use of the debentures and that an opinion was provided by that law firm approving the use of such debentures.

H.     The prosecutors failed to give the grand jurors standard instructions as to t he el ements o f t heft under I ndiana law i nstead providing them with copies of the statute and volumes of case law to read so that they could determine for themselves what the elements of the offense were.

I.     The prosecutors failed to preserve copies of the materials that were provided to the grand jurors in violation of the specific policies and procedures established by Marion County.

J.     Despite o ffering t o pr ovide D efendants with co pies of t he documents which ex onerated P laintiff, t he Defendants refused t o review t he docu ments or ev en co nsider t hem prior t o her indictment.

K.     Despite prosecuting Plaintiff for the preparation of debentures in the purchase by Nelms of the cemeteries, the Defendants, as part of a proposed pl ea de al for N elms, **approved the use of the same, identical debentures and mortgages prepared by Plaintiff,** in a proposed refinancing of the sale.

85.     Defendants instituted a criminal proceeding against Planitff.

86.     In i nstituting t he cr iminal proceeding t he Defendants, i ndividually and collectively, acted maliciously in causing charges to be brought against Plaintiff which lacked probable cause.

87.     Following a week long jury trial, Plaintiff was acquitted of all charges and was released from the custody of the Court.

88.     As a di rect an d pr oximate r esult o f D efendants' actions, Plaintiff has suffered and will continue to suffer extensive financial, emotional and physical damage.

WHEREFORE, P laintiff r espectfully r equests that t his C ourt award h er su ch monetary r elief as will co mpensate h er f or t he act ual d amages incurred, mental, emotional, and physical damages which she has suffered, punitive damages, and her actual attorneys fees incurred as a r esult o f t his lawsuit, as well as such further a nd other relief as this Court deems appropriate.

## COUNT II: ABUSE OF PROCESS

89.     Plaintiff her eby i ncorporates and r estates the al legations in paragraphs 1 through 88 as if fully set forth herein.

90.     Defendants individually and co llectively initiated a nd misused t he g rand jury process to bring unwarranted charges against Plaintiff in order to ruin her business and reputation.

91.     Defendants' use of the grand jury process was wrongful and improper.

92.     Defendants' actions were malicious and evidenced a reckless and callous disregard for, and a deliberate indifference, toward Plaintiff's constitutional rights.

93.     As a di rect and f oreseeable consequence o f these de privations, P laintiff was arrested an d d eprived o f her l iberty, su ffered ec onomic loss, em otional t rauma, physical harm, loss of privacy, and irreparable harm to her reputation.

WHEREFORE, P laintiff r espectfully r equests that t his C ourt award h er su ch monetary r elief as will co mpensate h er f or t he act ual damages incurred, mental, emotional, and physical damages which she has suffered, punitive damages, and her

actual attorneys fees incurred as a result of this lawsuit, as well as such further and other relief as this Court deems appropriate.

## COUNT III: VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS IN VIOLATION OF 41 U.S.C. SECTION 1983

94.     Plaintiff hereby incorporates and restates the allegations in paragraphs 1 through 93 as if fully set forth herein.

95.     Defendants are "persons" as that term is defined in 42 U.S.C. Section 1983.

96.     The Defendants, acting under color of state law, individually and in concert, initiated and continued criminal prosecutions against Plaintiff on five felony counts of theft of greater than $100,000.

97.     There was no probable cause for the criminal prosecution of Plaintiff.

98.     Defendants' actions were malicious and evidenced a reckless and callous disregard for, and a deliberate indifference to Plaintiff's constitutional rights.

99.     As a result of her wrongful prosecution, Plaintiff was seized, arrested, and deprived of her rights under the Fourth and Fourteenth Amendments of the United States Constitution.

100.    As a direct and foreseeable consequence of these deprivations, Plaintiff has suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, and irreparable harm to her reputation.

WHEREFORE, Plaintiff respectfully requests that this Court award her such monetary relief as will compensate her for the actual damages incurred, mental, emotional, and physical damages which she has suffered, punitive damages, and her

actual attorneys fees incurred as a result of this lawsuit, as well as such further and other relief as this Court deems appropriate.

### COUNT IV: VIOLATION OF 42 U.S.C. SECTION 1983—CONSPIRACY

101.   Plaintiff hereby incorporates and restates the allegations in paragraphs 1 through 100 as if fully set forth herein.

102.   Defendants are "persons" as that term is defined in 42 U.S.C. Section 1983.

103.   Under color of state law, Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the mind among themselves to deprive Plaintiff of her constitutional rights by charging and prosecuting the Plaintiff on charges of felony theft of over

$100,000.

104.   Defendants willfully participated in this illegal objective by various means, with the intent to further some purpose of the conspiracy, including but not limited to:

A.   publishing false and inflammatory public statements regarding Plaintiff;

B.   not informing authorities, the grand jury, and the court of exculpatory evidence;

C.   agreeing to make false and materially incomplete statements to the Marion County grand jury in order to obtain warrants and an indictment;

D.   Not providing complete information to the Plaintiff including exculpatory evidence during the trial;

E.   Failing to provide complete and accurate jury instructions to the grand jury and failing to maintain copies of the materials which were provided;

       F.    Knowingly providing testimony of witnesses to the grand jury which they knew or with the exercise of reasonable diligence should have known was false or incomplete.

105.    Defendants' actions evidenced a reckless and callous disregard for and deliberate indifference to Plaintiff's constitutional rights.

106.    As a direct and proximate result of this conspiracy, Plaintiff was deprived of her rights under the Fourth and Fourteenth Amendments of the United States Constitution.

107.    As a direct and foreseeable consequence of these deprivations, Plaintiff has suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, and irreparable harm to her reputation.

WHEREFORE, Plaintiff respectfully requests that this Court award her such monetary relief as will compensate her for the actual damages incurred, mental, emotional, and physical damages which she has suffered, punitive damages, and her actual attorneys fees incurred as a result of this lawsuit, as well as such further and other relief as this Court deems appropriate.

## COUNT V: CONSPIRACY IN VIOLATION OF 42 U.S.C. SECTION 1985(3)

108.    Plaintiff hereby incorporates and restates the allegations in paragraphs 1 through 107 as if fully set forth herein.

109.    Defendants are "persons" as that term is defined in 42 U.S.C, Section 1985.

110.    Under color of state law, Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among

themselves for the purpose of depriving, either directly or indirectly, the Plaintiff of the equal protection of the law an of her equal privileges and immunities under the law.

111.    Defendants' actions evidenced a reckless and callous disregard for and deliberate indifference to Plaintiff's constitutional rights.

112.    As a direct and proximate result of this conspiracy, Plaintiff was deprived of her rights under the Fourth and Fourteenth Amendments of the United States Constitution.

113.    As a direct and foreseeable consequence of these deprivations, Plaintiff has suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, and irreparable harm to her reputation.

WHEREFORE, Plaintiff respectfully requests that this Court award her such monetary relief as will compensate her for the actual damages incurred, mental, emotional, and physical damages which she has suffered, punitive damages, and her actual attorneys fees incurred as a result of this lawsuit, as well as such further and other relief as this Court deems appropriate.

## COUNT VI: CONSPIRACY IN VIOLATION OF 42 U.S.C. SECTION 1986

114.    Plaintiff hereby incorporates and restates the allegations in paragraphs 1 through 113 as if fully set forth herein.

115.    Defendants are "persons" as that term is defined in 42 U.S.C. Section 1986.

116.    Defendants had prior knowledge of the wrongs to be committed by the other Defendants.

117.    The D efendants  had t he p ower t o pr event or  ai d i n  preventing t he commission o f t he w rongs  conspired  to  be co mmitted by  t he ot her  Defendants, and which by reasonable diligence, could have been prevented, but they neglected and/or refused to prevent or to aid in the prevention of the commission of the wrongs conspired to be co mmitted by   other D efendants.  As a r esult o f t his  conspiracy P laintiff w as deprived o f her r ights und er t he F ourth  and F ourteenth A mendments  to t he U nited States Constitution.

118.    As a di rect and f oreseeable  consequence o f these de privations, P laintiff has suffered ec onomic loss, p hysical har m, em otional t rauma, l oss of l iberty, l oss of privacy, and irreparable harm to her reputation.

WHEREFORE, P laintiff r espectfully r equests  that t his C ourt  award h er su ch monetary r elief  as  will co mpensate h er f or t he act ual d amages  incurred,  mental, emotional, and p hysical damages which she has suffered,  puni tive damages, and her actual attorneys fees incurred as a r esult o f t his  lawsuit, as  well as  such further an d other relief as this Court deems appropriate.

### COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

119.    Plaintiff he reby incorporates and restates the allegations in paragraphs 1 through 118 as if fully set forth herein.

120.    Defendants  acted i ndividually and i  n co ncert t o  perpetuate  criminal charges against Plaintiff and to contact her clients and destroy her business.

121.    Counsel  for D efendants  advised t he  Indiana A ttorney G eneral  and t he Secretary o f S tate  for I ndiana  that D efendants  were act ing o utside the sco pe of t heir

jurisdiction and authority by contacting Plaintiff's clients and advising them that she was involved in criminal activity prior to any indictment by the grand jury.

122.   Plaintiff was assured that this contact would cease, but by that time the damages had already been done and Plaintiff's business interests and reputation were destroyed.

123.   Defendants repeatedly made false, insulting, offensive, inflammatory statements about Plaintiff calculated to shame, humiliate her and harm her reputation and business interests.

124.   Defendants knew or should have known through the exercise of reasonable diligence that such statements were false.

125.   These actions evidenced a pattern of extreme and outrageous behavior pursued with the intent to cause Plaintiff severe emotional and financial distress.

126.   The Defendants' conduct had the direct and foreseeable consequence of marking Plaintiff as a thief and a fraud in the minds of the general public.

127.   The Defendants' conduct had the further consequence of subjecting Plaintiff to extreme public and sustained obloquy, causing her to lose job opportunities, endure insults and subjecting her to assault by the local, national, and international press.

128.   The Defendants' conduct will continue to have deleterious effects on Plaintiff and forever be associated with the false allegations advanced by Defendants and which were repeatedly publicized.

129.   As a direct and foreseeable consequence of these deprivations, Plaintiff has suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of

privacy, and irreparable harm to her reputation.

WHEREFORE, P laintiff r espectfully r equests  that t his C ourt  award h er su ch monetary r elief  as  will co mpensate h er f or t he act ual d amages  incurred,  mental, emotional, and p hysical damages which she has suffered,  puni tive da mages, and her actual attorneys fees  incurred as  a r esult o f t his  lawsuit, as  well as  such further an d other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff hereby requests a trial by jury.

Respectfully submitted,

**BLANCO WILCZYNSKI, PLLC**


/s/Derek S. Wilczynski
Derek S. Wilczynski (P57079)
2095 E. Big Beaver, Ste 400
Troy, Michigan 48083
(248)519-9000


Dated: December 7, 2012